**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LOUIS ROBINSON,<br><br>*Plaintiff*,<br><br>*v.*<br><br>REYNALDO GUEVARA, GERI LYNN YANOW, as special representative of the ESTATE OF ERNEST HALVORSEN, ANTHONY WOJCIK, DANIEL ENGEL, JOHN MOSQUERA, CESAR ECHEVERRIA, EDWARD MINGEY, ROBERT BIEBEL, OSVALDO VALDEZ and the CITY OF CHICAGO,<br><br>*Defendants*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 24-cv-05954<br><br>**JURY TRIAL DEMANDED** |

**SECOND AMENDED COMPLAINT**

NOW COMES Plaintiff, LOUIS ROBINSON, by his attorneys LOEVY & LOEVY, and complaining of Defendants REYNALDO GUEVARA, GERI LYNN YANOW, as special representative of the ESTATE OF ERNEST HALVORSEN, ANTHONY WOJCIK, DANIEL ENGEL, JOHN MOSQUERA, CESAR ECHEVERRIA, EDWARD MINGEY, ROBERT BIEBEL, OSVALDO VALDEZ, and CITY OF CHICAGO, states as follows:

**INTRODUCTION**

1. Plaintiff Louis Robinson was arrested, prosecuted and wrongfully convicted of the 1996 shooting death of Kelly Velez. He spent 27 years in prison for a crime he did not commit.

2. Robinson had nothing to do with the murder. At all times since Defendants first accused him of the crime, he has maintained his innocence. He has now received a Certificate of Innocence from the State of Illinois.

3. There was not one piece of physical evidence connecting Plaintiff to the Velez murder.

4. Instead, Robinson's arrest, prosecution, and conviction were based entirely on false evidence knowingly manufactured by Defendants, who also concealed evidence of Plaintiff's innocence to ensure his conviction.

5. In fact, the misconduct resulting in Robinson's wrongful conviction was part of a now well-known pattern of illegal activity perpetrated by Defendants Guevara, Halvorsen and the other Defendants.

6. Plaintiff is one of more than 45 men and women who have had convictions on murder charges vacated after being framed in corrupt homicide investigations conducted by Defendant Guevara and his fellow Area Five detectives and supervisors.

7. The Illinois Appellate Court has called Defendant Guevara "a malignant blight on the Chicago Police Department and the judicial system."

8. Cook County courts have found that "Detective Guevara engaged in a pattern and practice of intimidating, threatening, and influencing witnesses in prior homicide investigations," and that Defendant Guevara had told "bald-faced lies" during court testimony and had "eliminated any possibility of [] being considered a credible witness in any proceeding."

9. Defendant Halvorsen, too, has been found by Cook County courts to have "engaged in a pattern and practice of misconduct in police investigations."

10. In court proceedings, Defendants Guevara, Halvorsen, and their associates have pleaded their Fifth Amendment right not to incriminate themselves in response to questions about their misconduct as police officers.

11. On August 10, 2023, more than 27 years after he was subjected to a wrongful arrest and conviction, Robinson was exonerated. His conviction was vacated and all charges against him were dropped.

12. Robinson now seeks justice for the harm that the Defendants have caused and redress for the loss of liberty and the terrible hardship that he has endured and continues to suffer as a result of their misconduct.

**JURISDICTION AND VENUE**

13. This action is brought pursuant to 42 U.S.C. § 1983 and Illinois law to redress the Defendants' tortious conduct and their deprivation of Plaintiff's rights secured by the U.S. Constitution.

14. This Court has jurisdiction of Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction of his state-law claims pursuant to 28 U.S.C. § 1367.

15. Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial district. The events and omissions giving rise to Plaintiff's claims occurred within this judicial district, including the investigation, prosecution, and trial resulting in Plaintiff's conviction.

**PARTIES**

16. Plaintiff Louis Robinson lived in Chicago, Illinois at the time of his arrest and wrongful prosecution and conviction. He spent 27 years wrongfully incarcerated for a murder that he did not commit.

17. At all times relevant to the events described in this complaint, Defendants Reynaldo Guevara, Ernest Halvorsen, Anthony Wojcik, Daniel Engel, Cesar Echeverria, John Mosquera, Edward Mingey, Robert Biebel, Osvaldo Valdez, and other unknown law enforcement officers were Chicago Police officers, acting under color of law and within the

scope of their employment. These Defendants are referred to collectively as the "Police Officer Defendants" throughout this complaint.

18. Geri Lynn Yanow, the special representative for the Estate of Ernest Halvorsen, deceased, is named as a Defendant in her capacity as Special Representative for the Estate of Ernest Halvorsen, as successor in interest and to defend this action on behalf of Defendant Ernest Halvorsen.

19. At all times relevant to the events described in this complaint, Edward Mingey, and Robert Biebel and other unknown law enforcement officers supervised the Police Officer Defendants. These Defendants participated in the misconduct alleged in this complaint and also facilitated, condoned, approved, and turned a blind eye to the misconduct of the Defendants whom they supervised.

20. The City of Chicago is an Illinois municipal corporation that is or was the employer of the above-named Defendants. Each of the individual Defendants named in this complaint acted during their investigation of the Kelly Velez murder as agents or employees of the City of Chicago. The City of Chicago is liable for all torts committed by the Defendants pursuant to the doctrine of *respondeat superior*. Additionally, the City of Chicago is responsible for the policies and practices of the Chicago Police Department.

21. Each and every individual Defendant, known and unknown, acted under color of law and within the scope of his or her employment at all times relevant to this lawsuit. Each of the individual Defendants is sued in his or her individual capacity unless otherwise noted.

## FACTS

### The Crime

22. On the night of June 20, 1996, Kelly Velez drove with a friend, Hilda Carrera, to see Velez's boyfriend, Oscar Betancourt.

23. They met at a gas station at 3057 North Kedzie Avenue, near the corner of Kedzie and Barry. Velez got out of the car to talk to Betancourt.

24. At 11:20 p.m., as Velez and Betancourt were chatting in the gas station parking lot in front of Velez's car, a maroon or burgundy car drove by and the driver fired several shots in their direction.

25. The shooter's car was on Kedzie, driving southbound. The car sped off after firing the shots.

26. Velez fell to the ground. She had been shot and later died from her wounds.

### Initial Police Investigation Reveals Witnesses Could Not Describe or Identify the Shooter

27. Hilda Carrera had been with Kelly waiting in the car. When the shooting occurred, she ducked down. When interviewed by police, she could not provide any description of the shooter or the shooter's car.

28. David Camacho, Dabney Tatum, Jose Nieves and Nelson Castillo were all at the gas station as well at the time of the shooting. They all ducked or dropped to the ground when they heard the shots. When interviewed by police that night, none of them could provide any description of the shooter or the shooter's car.

29. Francisco Rocha was in his apartment lying in bed when he heard gunshots and went to the window of his second-floor apartment on Kedzie, just South of the gas station where the shooting occurred. He saw a maroon car speeding away down Kedzie.

30. Rocha could not see the faces of anyone in the shooter's car and could not identify anyone.

31. When the first responding officers arrived at the scene, they interviewed Hilda Carrera, Oscar Betancourt and Francisco Rocha. The only description they could provide of the shooter was that he was a male Hispanic.

32. Louis Robinson is a dark-skinned African American.

33. There was no physical evidence of any kind that was ever tied or connected to Plaintiff Robinson.

**Defendants Fabricate a Reason to Frame Louis Robinson**

34. With no leads into who the perpetrator was and very limited descriptive information, there was little hope of solving the case.

35. But then, almost a week after the shooting, Defendants Guevara and Halvorsen joined the case.

36. Guevara and Halvorsen decided to frame Robinson because (1) Robinson refused Guevera's demand to pay protection money to Guevara to be able to sell drugs, and (2) because Plaintiff also refused Guevara's attempts to get Plaintiff to falsely implicate Guevara's chosen suspect in a different crime that Plaintiff knew nothing about.

37. With a desire to frame Plaintiff, suddenly a lead emerged. Defendants—including Defendants Guevara, Halvorsen, Wojcik, Engel, Mingey, Echeverria, Mosquera, and Biebel—formed a plan to frame Plaintiff for the Velez shooting.

38. Defendant Mingey claimed to have developed evidence that the shooter was a cousin of Rogelio Barnes, the victim of an earlier shooting on the same day as the Velez shooting. The motive was supposedly retaliation against Betancourt and the others who were with him at the gas station, who were members of a branch of the Maniac Latin Disciples.

39. Then, on June 25, Defendants Echeverria and Mosquera claimed to know that the cousin of Rogelio Barnes went by the nickname "Vamp." They claimed that Vamp fit the description of the Velez shooter.

40. Then, Defendants Wojcik and Engel claimed to know that Vamp was a nickname of Plaintiff Louis Robinson.

41. Then, Defendants Guevara and Halvorsen claimed that they obtained a photo of Louis Robinson and showed it to Defendants Echeverria and Mosquera, who confirmed that the photo was the person they knew as Vamp.

42. Defendants conspired to concoct this story, which was false and fabricated.

43. Among other things, Rogelio Barnes never suspected that Betancourt or any other Maniac Latin Disciples had shot him.

44. In addition, Defendants Echeverria and Mosquera claimed that Louis Robinson fit the description of the shooter, even though none of the eyewitnesses could provide any description of the shooter; and the limited and vague information they could provide—that the shooter was Hispanic—clearly did not fit Louis Robinson.

45. And Louis Robinson never had the nickname Vamp.

**Defendants Fabricate an Identification of Plaintiff From Betancourt**

46. Having concocted a story to make Plaintiff their suspect, Defendants then set out to manufacture evidence to frame him.

47. On June 26, 1996, Defendants brought Betancourt to Area 5. Despite the fact that Betancourt could provide virtually no description of the shooter, and his limited description did not fit Louis Robinson, Defendants, including Valdez, moved forward with identification procedures designed to cause a false identification of Plaintiff.

48. When they conducted these identification procedures, Defendants had no intention of accurately identifying the Velez shooter. Instead, they rigged the identification procedures with the sole purpose of framing Plaintiff.

49. Defendants first performed a photo array identification procedure with Betancourt and then a live lineup right after, claiming that Betancourt had positively identified Plaintiff in both procedures.

50. But in fact, this evidence was entirely fabricated. Betancourt could not identify Plaintiff, and did not identify him during the identification procedures until he was subjected to threats and other coercive tactics.

51. Betancourt initially told Defendants he could not identify Plaintiff. But after they threatened Betancourt that he would be charged for the crime if he did not identify Plaintiff, he finally relented.

52. None of these coercive tactics were ever documented or disclosed to Plaintiff. Instead, Defendants wrote false police reports claiming that Betancourt had independently and freely identified Plaintiff as the shooter.

53. In addition, they wrote a false police report claiming that Betancourt had told Defendants Guevara and Halvorsen that he got a clear look at the shooter and could make an identification. But as documented in the initial police interviews, Betancourt could not possibly make an identification of the shooter—a man he never met in his life, observed at most for a few seconds, in the middle of the night, in a moving car, while a gun was pointed at him.

**Plaintiff Denies Any Involvement in the Velez Shooting**

54. Defendants then brought Plaintiff to Area 5, where he was interrogated by Defendants. Plaintiff repeatedly denied any involvement in the shooting.

55. He also truthfully told the detectives about his whereabouts that night, which provided an alibi demonstrating his innocence. Plaintiff told Defendants that after his cousin Rogelio Barnes had been shot that night, he went to St. Mary's hospital to check on his cousin. He was told that his cousin was at another hospital, and so he left.

56. As he was leaving the hospital, Plaintiff encountered two police officers who were going to interview Barnes. Plaintiff told the officers that he was Barnes' cousin, and that Barnes was not at that hospital.

57. Plaintiff's statement was corroborated by others, including the two police officers Plaintiff encountered at the hospital.

**Defendants Fabricate a Claim That Plaintiff Lied About His Whereabouts on the Night of the Shooting**

58. Realizing that Plaintiff's statement, and his alibi, undermined their case against Plaintiff, Defendants wrote a police report falsely documenting what Plaintiff had told them.

59. They documented that Plaintiff denied ever going to St. Mary's Hospital. As discussed above, this was false. Plaintiff had gone to St. Mary's, and told the Defendants that during his interrogation.

60. This conduct—falsifying a suspect's statement to undermine their alibi and imputing to them a false statement that could be easily impeached—is part of a consistent pattern of misconduct employed by Defendants, including in particular Defendants Guevara and Halvorsen.

61. Defendants Guevara and Halvorsen have used this same type of fabricated alibi evidence in framing, among others, Demetrius Johnson, Geraldo Iglesias, and Thomas Sierra. Each of those men were convicted of murders, and then later exonerated and certified innocent.

**Defendants Manufacture More Evidence to Frame Robinson**

62. Knowing that their case hung entirely on a fabricated, and inherently dubious, identification from Betancourt, Defendants set out to manufacture additional evidence to frame Plaintiff.

63. Defendants were aware that when Plaintiff was arrested he was wearing a distinctive gold necklace with a medallion. Defendants took that necklace into evidence.

64. Defendants then went back to Francisco Rocha, who they knew had a pending criminal case at the time. Even though Rocha had only seen the shooter's car out of his window as it was speeding away, Defendants coerced him into falsely testifying that he had seen the driver was wearing a gold necklace with a medallion.

65. Rocha had never made this claim at any earlier point in the investigation, as documented in the initial contemporaneous reports of the police interviews of Rocha, which made no reference whatsoever to a gold chain or medallion.

66. This is because it was false, as Rocha recently revealed. Rocha did not, and could not, see the shooter wearing any sort of distinctive jewelry of any kind when he looked out his window and saw a car speeding away.

67. Defendants also concealed other investigative steps taken during the course of the investigation that would have provided evidence of Plaintiff's innocence.

68. For example, on the night of the shooting Defendants Wojcik and Engel located a car that matched the description of the shooter's distinctively colored car. Rocha and another person were shown the vehicle and confirmed that it looked like the shooter's car. The car was unoccupied and parked in the street, and the police file indicates additional steps were to be taken to follow up on that lead.

69. However, that investigation was suppressed from Plaintiff and his criminal defense attorneys. The entire homicide file for the Velez murder is missing any police reports or notes about who the Defendants learned had been in possession of that vehicle.

70. There is no evidence connecting Robinson to that car, or any other maroon or red car similar to the one used in the shooting.

71. The homicide file indicates that Defendants wrote more than 20 pages of General Progress Reports, or handwritten notes, regarding their investigation. Upon information and believe, Defendants removed many of these notes from the homicide file. Those notes were not turned over to Plaintiff or his criminal defense attorneys, and are no longer contained in the Velez homicide file.

**Defendants Suppress Their Investigative Misconduct**

72. The false police reports described above were approved by Defendants Mingey and Biebel.

73. The false police reports were used to cover up evidence of Defendants' misconduct. They were provided to state prosecutors and became a basis for charging and prosecuting Plaintiff.

74. In addition, Defendants gave false statements to state prosecutors and provided false testimony at Plaintiff's criminal trial, and in those statements as well they made it appear as though they had a legitimate basis to pursue Plaintiff as a suspect and that Betancourt had legitimately identified Plaintiff as Velez's killer without any police manipulation.

75. At all times, Defendants suppressed the true circumstances of the coercive tactics used during the identification procedures and their interactions with Betancourt and Rocha.

76. At all times, Defendants suppressed the truth about what Plaintiff had told them when he was interrogated, which was that he had gone to St. Mary's Hospital to check on his cousin Rogelio.

77. Defendants did not disclose their misconduct to Plaintiff or his attorneys.

78. At all times, Defendants Mingey and Biebel were aware of the Defendants' misconduct and their fabrication of a case against Plaintiff, and participated in those efforts. These supervisors nevertheless intentionally ignored Defendants' misconduct, and decided to make Plaintiff liable for a crime he did not commit, rather than directing the officers to find the person who had actually committed the crime. In addition, these supervisors explicitly authorized the other Defendants' investigative misconduct.

79. In addition, on information and belief, the Defendants suppressed and destroyed additional evidence still unknown to Plaintiff, which would also have shown Plaintiff's innocence.

**Plaintiff's Wrongful Conviction and Imprisonment**

80. As a result of Defendant's misconduct, Plaintiff was tried in the Circuit Court of Cook County. Plaintiff's criminal trial began in August 1997.

81. There was no physical evidence of any kind linking Plaintiff to the crime.

82. Instead, the case against Plaintiff was based on the fabricated evidence Defendants manufactured, including the false identification of Plaintiff Defendants obtained from Betancourt, who testified and identified Robinson as the gunman.

83. Other fabricated evidence used against Plaintiff included the false claim that Rocha had seen the shooter wearing a gold necklace with a medallion.

84. Without the fabricated and false evidence Defendants extracted, Plaintiff would never have been convicted.

85. Plaintiff was convicted of first-degree murder and aggravated discharge of a firearm. He was sentenced to 60 years in prison.

86. Plaintiff was 28 years old at the time of his arrest. The following decades of his life were consumed by the horror of wrongful imprisonment.

87. Because of the Defendant's misconduct, Plaintiff's opportunity to grow older with his family and make a life with them was taken away. Plaintiff's relationships with his daughter and the rest of his family were severely harmed.

88. Plaintiff was stripped of his young adulthood and deprived of opportunities to gain an education, to engage in meaningful labor, to develop skills and a career, and to pursue his interests and passions.

89. Plaintiff has been deprived of all the basic pleasures of human experience, which all free people enjoy as a matter of right, including the freedom to live one's life as an autonomous human being.

90. Plaintiff never knew whether the truth would come out or whether he would ever be exonerated.

91. Plaintiff spent decades in prison before being released. In addition to the severe trauma of wrongful imprisonment and Plaintiff's loss of liberty, the Defendants' misconduct continues to cause Plaintiff extreme physical and psychological pain and suffering, humiliation, constant fear, anxiety, deep depression, rage, and other physical and psychological effects.

92. Plaintiff was branded a murderer. He has suffered profound reputational harm as a result.

## Plaintiff's Exoneration

93. On October 22, 2019, Plaintiff filed a pro-se Post-Conviction Petition for Relief from Judgment. He filed an amended post-conviction petition in September 2022, with additional evidence of his innocence, and of Defendant Guevara's pattern of misconduct.

94. In November 2022, Betancourt provided a sworn affidavit saying that if he were called to testify about whether his identification of Plaintiff was fabricated and whether his testimony that he could identify Plaintiff as the shooter was false, he would assert his Fifth Amendment protection against self-incrimination.

95. In March 2023, a third stage evidentiary hearing was held.

96. On August 10, 2023, Judge Stephenson granted the petition and vacated Robinson's convictions.

97. The prosecution dismissed all charges related to the Velez shooting.

98. Robinson was released nearly 27 years after his wrongful arrest.

## Chicago's Policy and Practice of Wrongly Convicting Innocent Persons in Violation of the Constitution

99. The City of Chicago and the Chicago Police Department are responsible, by virtue of their official policies, for inflicting miscarriages of justice in scores of criminal cases like the one endured by Plaintiff.

100. Since the 1980s, well more than 100 cases have come to light in which Chicago police officers fabricated false evidence and/or suppressed exculpatory evidence to cause the convictions of innocent persons for serious crimes they did not commit.

101. These cases include many in which Chicago police officers used the same tactics that Defendants employed against Plaintiff in this case, including but not limited to fabricating evidence, concealing exculpatory evidence, coercing confessions and statements through

physical and psychological abuse, manipulating witnesses to influence eyewitness identifications and testimony, and using other tactics to secure the arrest, prosecution, and conviction of a person without probable cause and without regard for the person's actual guilt or innocence.

102. Mayor Brandon Johnson himself has acknowledged the history of misconduct of the Chicago Police Department, acknowledging that "[t]he history of brutality in this City is well documented."

103. At all relevant times, members of the Chicago Police Department, including the Defendants in this action, routinely fabricated and manipulated identification procedures to procure suspect identifications that they knew to be inaccurate.

104. At all relevant times, members of the Chicago Police Department, including the Defendants in this action, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos, and other information. This concealed material was kept in files that were maintained only at the Chicago Police Department and never disclosed to the participants of the criminal justice system. As a matter of widespread custom and practice, these clandestine files were withheld from the State's Attorney's Office and from criminal defendants, and they were routinely destroyed or hidden at the close of the investigation rather than being preserved as part of the official file.

105. Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including the named Defendants, concealed exculpatory evidence from Plaintiff.

106. The existence of this policy and practice of suppressing exculpatory and/or impeaching material in clandestine files was established and corroborated in the cases of, *inter*

*alia*, *Rivera v. Guevara*, No. 12 C 4428 (N.D. Ill.), *Fields v. City of Chicago*, No. 10 C 1168 (N.D. Ill.), and *Jones v. City of Chicago*, No. 87 C 2536 (N.D. Ill.).

107. The policies and practices of file suppression at issue in *Fields* applied throughout the timeframe from the 1980s through the 2000s, including at the time of the investigation at issue here.

108. In addition, a set of clandestine files related to Area Five homicides—the same Detective Division involved in this case—was found in the case of *Rivera v. Guevara*, No. 12 C 4428 (N.D. Ill.). Those files, for a period in the 1980s and 1990s, contained exculpatory and impeaching evidence not turned over to criminal defendants.

109. The policy and practice of suppressing exculpatory and/or impeaching material evidence was alive and well at all relevant times, including at the Area Five Detective Division during the investigation at issue here.

110. In addition, the City of Chicago and the Chicago Police Department routinely used illegal tactics, including torture, physical coercion, and psychological coercion, to extract involuntary and false confessions and statements from suspects and witnesses. There are well over 250 documented cases of Chicago Police officers using torture and coercion to illegally obtain confessions in homicide cases. The City had notice of this widespread practice of procuring false and coerced confessions long before the events at issue in this case.

111. Moreover, the City of Chicago and the Chicago Police Department routinely failed to investigate cases in which Chicago police detectives recommended charging an innocent person with a serious crime, and no Chicago police officer has ever been disciplined as a result of his misconduct in any of those cases.

112. Prior to and during the period in which Plaintiff was falsely charged and convicted, the City of Chicago also operated a dysfunctional disciplinary system for Chicago police officers accused of serious misconduct. The City almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. Further, the disciplinary apparatus had no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

113. For instance, multiple witnesses have come forward with evidence that Defendant Guevara was part of Miedzianowski's criminal enterprise. Defendant Guevara and Miedzianowski worked together in gang crimes before Defendant Guevara became homicide detective. Defendant Guevara used his status as a detective to advance the criminal drug enterprise he participated in with Miedzianowski, and to pressure drug dealers that did not do their bidding. Guevara's assistance included working with Miedzanowski to pin murders on innocent men.

114. In *Klipfel v. Bentsen*, No. 94 C 6415 (N.D. Ill), a federal jury in Chicago returned a *Monell* verdict against the City, finding that the City was responsible for maintaining a code of silence and a deeply flawed disciplinary system that allowed Chicago police officers (operating out of the very same police facilities as the Defendant Officers in this case) to operate a far-reaching, long-running criminal enterprise that included the subversion of homicide investigations.

115. The *Klipfel* plaintiffs were two former federal agents from the Bureau of Alcohol, Tobacco and Firearms who brought allegations of rampant criminal misconduct among Gang Crimes officers to the attention of CPD officials. The evidence in that litigation included: Philip Cline, an Area Commander and future Chief of Detectives and Superintendent, personally filed

two Internal Affairs complaints against Miedzianowski for tampering in homicide investigations, that resulted in no discipline whatsoever; and that Raymond Risley, an assistant deputy superintendent and head of Internal Affairs, not only knew about misconduct in homicide cases but actively participated in efforts to subvert the disciplinary investigation into Miedzianowski that was at the heart of the *Klipfel* litigation.

116. As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence within the Chicago Police Department, which has been acknowledged by leaders of the Chicago Police Department and elected officials in Chicago. In accordance with the code of silence, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

117. As a result of the City of Chicago's established practices, officers (including the Defendants here) have come to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse circumstances. The practices that enable this belief include failing to track and identify police officers who are repeatedly accused of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct, and facilitating a code of silence within the Chicago Police Department. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens.

118. This belief extends to the Defendants in this case. By way of example, Defendant Guevara has a long history of engaging in the kind of investigative misconduct that occurred in this case. There are dozens of known cases in which Guevara and other Chicago police officers engaged in serious investigative misconduct similar to that described above. They engaged in

such misconduct because they had no reason to fear that the City of Chicago and its Police Department would ever discipline them for doing so.

119. The City of Chicago and its Police Department also failed in the years before the Plaintiff's wrongful conviction to provide adequate training to Chicago police detectives and other officers in many areas, including the following:

120. The conduct of live lineup, photographic, and other identification procedures.

121. The constitutional requirement to disclose exculpatory evidence, including how to identify such evidence and what steps to take when exculpatory evidence has been identified in order to ensure that the evidence is made part of the criminal proceeding.

122. The need to refrain from physical and psychological abuse, and manipulative and coercive conduct, in relation to suspects and witnesses.

123. The risks of wrongful conviction and the steps police officers should take to minimize risks.

124. The risks of engaging in tunnel vision during investigation.

125. The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

126. The need for police officers to be trained in these areas was and remains obvious. The City's failure to train Chicago police officers as alleged in the preceding paragraph caused Plaintiff's wrongful conviction and his injuries.

127. The City's failure to train, supervise, and discipline its officers, including the Defendants, condones, ratifies, and sanctions the kind of misconduct that the Defendants committed against Plaintiff in this case. Constitutional violations such as those that occurred in

this case are encouraged and facilitated as a result of the City's practices and de facto policies, as alleged above.

128. The City of Chicago and final policymaking officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

129. The policies and practices described in the foregoing paragraphs were also approved by the City of Chicago policymakers, who were deliberately indifferent to the violations of constitutional rights described herein.

**Defendant Guevara's History of Framing Innocent Persons**

130. As a result of the policies and practices of the Chicago Police Department, described above, Defendant Guevara has framed dozens of other innocent men and women over the span of two decades. Like Plaintiff, these men and women have lodged independent accusations of similar misconduct against Defendant Guevara.

131. As of the filing of this complaint, more than 40 men and women have had their convictions thrown out because of Defendant Guevara's misconduct. They include Jacques Rivera, Juan Johnson, Jose Montanez, Armando Serrano, Jorge Pacheco, Roberto Almodovar, William Negron, Jose Maysonet, Angel Rodriguez, Santos Flores, Arturo DeLeon-Reyes, Gabriel Solache, Ariel Gomez, Xavier Arcos, Ricardo Rodriguez, Robert Bouto, Thomas Sierra, Geraldo Iglesias, Demetrius Johnson, David Gecht, Richard Kwil, Ruben Hernandez, Juan Hernandez, Rosendo Hernandez, Ray Munoz, David Lugo, Carlos Andino, Daniel Rodriguez, Jaime Rios, Jose Cruz, Marilyn Mulero, Nelson Gonzalez, Johnny Flores, Adolfo Rosario, Eruby

Abrego, Jeremiah Cain, Edwin Davila, Alfredo Gonzalez, Gamalier Rivera, Madeline Mendoza, John Martinez, Thomas Kelly, Jose Tinajero and Plaintiff Louis Robinson. These men and women served hundreds of years in prison for crimes they did not commit.

132. Defendant Guevara has a long history of engaging in precisely the kind of investigative misconduct that occurred in this case, including obtaining false eyewitness identifications through manipulated identification procedures, manipulating witnesses, fabricating evidence, suppressing exculpatory evidence, and coercing false confessions and false statements from suspects and witnesses using physical and psychological violence, all in the course of maliciously prosecuting innocent persons. In addition to the cases in which individuals have been exonerated, there are dozens of other identified cases in which Defendant Guevara engaged in serious investigative misconduct.

133. Given this extensive history of misconduct and the City of Chicago's failure to meaningfully supervise or discipline Guevara and others, it is apparent that Guevara engaged in such misconduct because he had every reason to believe that the City of Chicago and its Police Department condoned his behavior.

134. Repeatedly, Defendant Guevara has invoked his Fifth Amendment right to not answer questions about allegations against him because truthful responses could subject him to criminal liability. The allegations Defendant Guevara has refused to respond to include allegations that he has manipulated dozens of witnesses to provide false identifications, he has fabricated false evidence, he has suppressed exculpatory evidence, including documentary evidence, he has tortured and abused suspects and witnesses and has coerced false statements from them, as well as every single instance of misconduct detailed below.

135. A few examples of Defendant Guevara's misconduct include:

a. Bill Dorsch is a former Chicago police detective. While serving with the Chicago Police Department, Dorsch was assigned to investigate a murder. Several months after the murder occurred, Defendant Guevara brought to the police station two juveniles purporting to have witnessed a shooting and recorded the license place of the shooter. Based on the information provided, Detective Dorsch created a photo array for the juveniles in an attempt to identify the shooter. While the first juvenile was viewing the photo array, and before he identified any of the photographs, Defendant Guevara pointed to the suspect's photo and told the juvenile "That's him." The juvenile then agreed with Guevara, identifying the flagged individual as the shooter. Following this, Dorsch directed Defendant Guevara to leave the room and had the other juvenile view the same photo array; this juvenile was unable to make any identification. Based on the first juvenile's identification, the suspect was charged with murder. Subsequently, Dorsch spoke to the two juveniles outside of Defendant Guevara's presence. The juveniles admitted that they were paid to falsely claim that the suspect was the person responsible for the shooting. After prosecutors spoke to the two juveniles, the suspect was released.

b. Defendant Guevara's activities have drawn the interest of federal law enforcement officers. In 2001, the FBI authored a special report detailing the criminal activity of Chicago police officer Joseph Miedzianowski and his associates, including Defendant Guevara. The report details that Defendant Guevara, while acting in his capacity as a police officer, would apprehend drug and gun dealers and then allow them to "buy their way out of trouble." According to the report, Guevara

also took bribes to alter both positive and negative lineups of murder suspects. Finally, the report states that Guevara, using an attorney as a conduit, would receive cash in exchange for the ultimate dismissal of murder cases he investigated.

c. In 1989, Defendant Guevara coerced Samuel Perez into falsely identifying Juan Johnson as the person who killed Ricardo Fernandez. Defendant Guevara made Perez get inside his car, showed Perez a photo of Juan Johnson, and told Perez that he wanted Johnson to take the blame for the murder. Unsurprisingly, Perez went on to falsely identify Johnson as one of the murderers.

d. In 1989, Defendant Guevara also coerced Salvador Ortiz into making a false identification of Juan Johnson, which he later recanted.

e. Juan Johnson was exonerated and brought suit against Defendant Guevara. A federal jury found that Guevara framed Johnson for murder and awarded Johnson $21 million in damages.

f. In 1988, Defendant Guevara caused 12-year-old Orlando Lopez to falsely identify Jacques Rivera as the person who shot Felix Valentin. As a result, Rivera was convicted of the Valentin murder. In 2011, Lopez testified at an evidentiary hearing that he knew Rivera was the "wrong guy" when he made the identification. As a result, Rivera received a new trial. Ultimately, the State's Attorney dropped all charges and Rivera was granted a certificate of innocence.

g. Also during the Felix Valentin shooting investigation, Defendant Guevara falsely claimed that the victim, Valentin, identified Jacques Rivera as his shooter before he died. Defendant Guevara reported to have obtained this identification at a time

when the victim was in a medically induced coma, unresponsive to any stimuli, and laying in a bed that was in constant motion to prevent his lungs from filling with fluid and killing him. Valentin could not possibly have provided the information that Defendant Guevara attributed to him.

h. After Jacques Rivera's exoneration, he brought suit against Defendant Guevara. A federal jury found that Guevara had violated Rivera's civil rights and awarded Rivera $17 million in damages, as well as $175,000 in punitive damages against Defendant Guevara, his partner Steve Gawrys, and his supervisor Ed Mingey.

i. In 1989, Defendant Guevara coerced Virgilio Muniz into making a false identification by repeatedly threatening Muniz, saying that if Muniz did not identify Manuel Rivera as the murderer, Muniz would "go down for the murder."

j. In 1989, Defendant Guevara coerced Virgilio Calderon Muniz (unrelated to Virgilio Muniz, described in the above paragraph) into making a false identification by telling him who to identify and making a veiled threat as to what would happen if he did not comply.

k. In 1991, Defendant Guevara coerced Wilfredo Rosario into making a false identification and giving false testimony before the grand jury. Guevara threatened that if Rosario did not identify Xavier Arcos as the murderer, Rosario would be "pinned" for the murder. Guevara fed Rosario details of the crime, such as the number of shots fired, the type of vehicle used in the crime, and the participants in the crime. Rosario recanted his identification of Arcos at trial. Though Arcos was still found guilty of murder by a jury, the appellate court overturned the conviction based on the lack of sufficient evidence.

l. In 1991, Defendant Guevara told Efrain and Julio Sanchez to pick David Colon out of a lineup. As a result, these men falsely accused Colon of committing a murder, but later came forward to recant and shed light on Defendant Guevara's misconduct.

m. In 1993, Defendant Guevara coerced an identification from Carl Richmond with threats, saying that he could make Richmond's life very uncomfortable if Richmond did not identify Robert Bouto as the murderer of one of Richmond's friends. Richmond, who was familiar with Guevara's tactics, believed that Guevara would honor this threat.

n. In 1995, Defendant Guevara arrested Edwin Davila and, in an attempt to coerce a confession, chained Davila to the wall of an interrogation room and told him that he was going to frame him for murder. After Davila maintained that he was uninvolved, Guevara forced Davila to participate in a lineup in which two witnesses identified Davila as the perpetrator, despite that each of those witnesses previously told the police that they had not been able to see the shooter.

o. In 1995, Defendant Guevara coerced Evelyn Diaz into making a false identification and providing false testimony to the Grand Jury by threatening Diaz that, if she did not identify Luis Serrano as the shooter, her children would be taken away by the Department of Children and Family Services.

p. In 1995, Defendant Guevara told Luis Figueroa to falsely identify Angel Diaz as the perpetrator even though Figueroa did not see anything. Figueroa identified Diaz but recanted his identification at trial.

q. In 1995, Defendant Guevara coerced Gloria Ortiz Bordoy into making a false statement and testifying falsely against Santos Flores at trial. During Ortiz Bordoy's six-to-eight hour interrogation, Guevara yelled in her face, threatened that her children would be taken by the Department of Children and Family Services, called her "the B word," and "raised his hand," saying that he "felt like smacking" her. Finally, without reading its contents, Ortiz Bordoy signed a statement that the detectives wrote out for her because she just wanted to "get out of there."

r. In 1995, Defendant Guevara coerced Rodolfo Zaragoza, who was a victim and an eyewitness to a crime, into making a false identification and providing false testimony. Zaragoza was intimidated by Guevara and identified Ricardo Rodriguez as the offender because Guevara told him that Rodriguez was the shooter.

s. In 1995, Defendant Guevara told Jose Melendez to falsely identify Thomas Sierra as the shooter of Noel Andujar, even though Melendez had not seen the shooter and told Defendant Guevara as much. In addition, Defendant Guevara wrote false reports saying that Jose Melendez and Alberto Rodriguez had identified a car as the one used in the Andujar shooting, when in fact both men had told Defendant Guevara that the car in question was not the one used in the shooting.

t. In 1996, Defendant Guevara coerced Maria Rivera into making a false identification by unzipping his pants and propositioning her. Rivera later told the prosecutor that she had falsely identified an individual in a lineup at Guevara's direction. The prosecution abandoned murder charges against that individual.

u. In 1997, Defendant Guevara coerced Robert Ruiz into making a false identification. Guevara detained Ruiz repeatedly over the course of a ten-day period, locking him in an interrogation room without food, water, or a bathroom. Though Ruiz kept telling Guevara that he had not seen the shooter or the driver involved in the crime, Guevara told Ruiz whom to identify and what to say in his statement. Ruiz finally implicated Freddy and Concepcion Santiago in the murder because Ruiz believed that Guevara would continue to harass him until he changed his story. Ruiz recanted his identification at trial, and the judge found Freddy and Concepcion Santiago not guilty. The trial judge found it disturbing that Guevara was the lead detective in the case because the victim was Guevara's nephew.

v. In November 2001, Defendant Guevara's girlfriend, Judith Martinez, attended a trial in which Guevara was testifying and observed the testimony of trial witnesses. She then conferred with Guevara, even though the Court had ordered for all witnesses to be excluded from the courtroom to prevent witness collusion.

w. In 2011, the First District Appellate Court granted Tony Gonzalez a post-conviction hearing based on evidence that Defendant Guevara conducted an unduly suggestive lineup. In this instance, Guevara had concocted a photo array in which Gonzalez's photo was the only one that stood out from the rest.

x. In 1982, Defendant Guevara and another officer arrested and physically assaulted Annie Turner for smoking on a bus. Guevara called her a "bitch" and pushed her out of the back door of the bus. He twisted her arm, threatened to "snap" it, and handcuffed her so tightly that her skin broke. He also hit her across the face with a

metal bracelet he was wearing and called her a "nigger bitch." Turner sought medical treatment and filed a complaint with the Chicago Police Department's Office of Professional Standards (OPS).

y. In 1982, Defendant Guevara and three other officers broke through Almarie Lloyd's locked front door and conducted a warrantless search of her home. When Lloyd asked who they were, she was told to shut up. The officers terrified Lloyd, her brother, and her two children, and left the home in shambles. Lloyd filed a complaint with OPS the next day.

z. In 1983, Defendant Guevara and other officers forcibly removed Leshurn Hunt from his home and handcuffed him to a ring in the wall at the police station where he was beaten about the head, face, and body until he confessed to murder and robbery charges. Hunt was detained for approximately 23 hours and deprived of food, water, and sleep until after he confessed. Hunt sought medical treatment for his injuries and filed a complaint with the Office of Professional Standards. Witnesses who saw Hunt while in custody corroborated his claims that the Area Five police beat him. The criminal court judge suppressed Hunt's confession, and a jury returned a favorable verdict in a related civil rights action against the City of Chicago on Hunt's claim of excessive detention.

aa. In 1984, Defendant Guevara and other officers physically assaulted Graciela Flores and her 13-year old sister, Ana, during a search of their home. During the search, officers did not identify themselves as police. Guevara repeatedly slapped Graciela, called her a "bitch," and pulled her hair. As a result of this incident, Graciela's arm was put in a sling and she spent one week in the hospital.

bb. In 1985, Defendant Guevara attempted to coerce a false statement from Reynaldo Munoz. Guevara handcuffed Munoz and put him in the back of a squad car. When Munoz denied any knowledge of the incident Guevara was asking about, Guevara repeatedly hit him in the mouth with his fist. Guevara then took Munoz to rival gang territory where he allowed rival gang members to spit on Munoz and beat Munoz about the head.

cc. In 1986, Defendant Guevara threw Rafael Garcia against a car, struck him in the face several times, kicked him, and hit him in the head. Garcia filed a complaint with OPS. Although Guevara denied the charges, Garcia's complaints were corroborated by physical evidence, as Garcia was treated at the hospital for lacerations to the head. After an investigation into the incident, OPS found that Guevara had lied about the incident and recommended that Guevara be suspended for two days.

dd. In 1986, Defendant Guevara and two other officers coerced a confession from Daniel Pena by beating him about the face and ribs with their hands and about the groin and thighs with flashlights. Pena was taken to see a doctor where he complained about being beaten by the police. The doctor found bruising to Pena's legs and abrasions and lacerations to Pena's nose. Family members corroborated Pena's claims that he had been beaten while in police custody.

ee. In 1986, Defendant Guevara pulled over Melvin Warren because Warren cut him off while driving westbound on Augusta Boulevard. Guevara called Warren a "nigger dog" and "threatened to tear [Warren's] head off." Guevara hit Warren in the face with a closed fist and then forced him down into the front seat of his car

and began to choke him. Two eyewitnesses confirmed that Guevara initiated the beating. In response to this incident, Warren sought medical treatment and filed a complaint with OPS. OPS sustained Warren's allegations that Guevara had physically and verbally assaulted him and recommended that Guevara be reprimanded.

ff. In 1989, Defendant Guevara coerced a false confession from Victor Vera by transporting him to rival gang territory and threatening to release him unless he confessed to the murder of Edwin Castaneda. Fearing for his life, Vera agreed to falsely confess to a crime that he had nothing to do with.

gg. In 1991, Defendant Guevara coerced David Rivera into signing a confession for murder by intimidation, threats, and inducements. Guevara told Rivera that if he confessed, he would serve seven years in prison; if he did not confess, he would be sent away for fifty years. Guevara then promised Rivera that if signed a statement, he could go home.

hh. In 1992, Defendant Guevara engaged in misconduct when he interrogated Jacqueline Montanez without a youth officer present. The appellate court reversed and remanded Ms. Montanez's conviction for murder, nothing that "not only was the defendant interrogated before having an opportunity to confer with a concerned adult, but, worse, any opportunity to do so was effectively frustrated by police."

ii. In 1993, Defendant Guevara arrested 15-year-old Eliezar Cruzado and threatened him with life imprisonment if Cruzado did not make a statement implicating himself in a murder. Guevara also told Cruzado that he could go home and see his

family again, but only if he agreed to make a statement. At the time, Cruzado had a limited ability to read and write.

jj. In 1993, Defendant Guevara used physical force and threats to coerce a false confession from Adolfo Frias-Munoz. Over the course of the two-day interrogation, Frias-Munoz was handcuffed to a ring on the wall of the interrogation room, hit in the face with an open hand by Defendant Guevara, and beaten by two other officers. Though isolated in a locked interrogation room, Frias-Munoz could hear his wife screaming and his son crying in another room. Guevara threatened Frias-Munoz that if he did not confess, his wife would go to prison and his children would be taken away. Frias-Munoz, who did not speak English, agreed to give a statement to an Assistant State's Attorney. Frias-Munoz spoke in Spanish and Guevara translated the statement so that the prosecutor could write the statement in English. Frias-Munoz then signed a statement that he could not read.

kk. In 1993, Defendant Guevara physically abused and threatened Francisco Vicente into providing false statements implicating Geraldo Iglesias in a murder. Vicente claimed that Iglesias spontaneously confessed to him that he was guilty of the crime for which Guevara had arrested him. Vicente has since testified that his statements were false and that Defendant Guevara and his colleagues beat him, threatened him, and fed him facts to ensure that he told their story.

ll. In 1994, Defendant Guevara, after 14 hours of interrogation, coerced a confession from Adrian Duta by hitting him in the face with an open palm, punching him in the stomach, and telling him he could go home if he signed a statement. When

Duta's father came to see Duta at the station house, Duta was exhausted and crying. Duta repeatedly said that he did not know what he had signed and had only signed the document so he could go home. Duta complained to his father of being struck in the head and stomach by Guevara.

mm. In 1995, Defendants Guevara and Halvorsen coerced a confession from 17-year-old Santos Flores after handcuffing him to the wall of a locked interview room and refusing his requests for an attorney. During the course of the 11-hour interrogation, Guevara yelled at him, slapped him numerous times on the side of his head, and told him that, if he did not confess, he would never see the light of day. Flores eventually gave a statement to the police indicating his involvement in the crime. Flores' statement was ruled inadmissible on appeal on the grounds that it was elicited in violation of Miranda.

nn. In 1997, Defendant Guevara coerced a false confession from Voytek Dembski by beating him while he was chained to a wall in a locked interrogation room. Dembski, a Polish national who did not speak English, was interrogated by Guevara without Miranda warnings, without notification to the Polish consulate, and without a Polish language interpreter. Dembski could not read the statement he eventually signed as it was written in English.

oo. In 1997, Defendant Guevara used threats and physical force against Ariel Gomez, Paul Yalda, and several of their co-defendants to try to get them to sign false statements incriminating Gomez in the shooting of Concepcion Diaz. Guevara also used pressure and threats to try to force three eyewitnesses, Ruth Antonetty,

Debbie Daniels and Maria Castro, to falsely identify Ariel Gomez as the shooter even after they informed Guevara that they could not identify him as the shooter.

pp. In 1998, Defendant Guevara repeatedly hit Rosauro Mejia in an attempt to coerce a confession from him. Mejia never confessed and was finally released after being held in custody for three days.

qq. In 1998, Defendant Guevara repeatedly pulled Adriana Mejia's hair and struck her once on the back of her neck while she was interrogated. She asserts that Guevara never took an accurate statement from her, despite that she did have real knowledge of the crime he was questioning her about.

rr. In 1998, Defendant Guevara repeatedly threatened and beat Arturo DeLeon-Reyes in order to coerce DeLeon-Reyes into giving an incriminating statement. After two days of isolation and interrogation, DeLeon-Reyes provided a false statement implicating himself in a murder in which he was not involved.

ss. In 1998, Defendant Guevara repeatedly struck Gabriel Solache on the left side of his head and in the stomach while Solache was chained to the wall of a locked interrogation room. After 40 hours of interrogation, Solache gave a false statement so that the beating would stop. Solache sought medical treatment and sustained permanent hearing loss to his left ear.

tt. In 1991, Defendant Guevara framed Demetrius Johnson for killing Edwin Fred. Guevara suppressed a lineup report documenting that a key eyewitness had identified a different person as the perpetrator in a lineup, and he fabricated a false police report to make it appear as if that identification had never occurred. In addition, to support his case against Johnson, Guevara manipulated and fabricated

eyewitness identifications of Johnson as the shooter from witnesses Rosa Burgos, Ricardo Burgos, and Elba Burgos.

136. Defendant Guevara never received discipline from the City of Chicago or the Chicago Police Department for any of the conduct set out above.

**Defendant Wojcik's History of Framing Innocent Persons**

137. Defendant Wojcik has a long history of engaging in precisely the kind of investigative misconduct that occurred in this case, including obtaining false eyewitness identifications through manipulated identification procedures, manipulating witnesses, fabricating evidence, suppressing exculpatory evidence, and coercing false confessions and false statements from suspects and witnesses using physical and psychological violence, all in the course of maliciously prosecuting innocent persons. In addition to the cases in which individuals have been exonerated, there are dozens of other identified cases in which Defendant Wojcik engaged in serious investigative misconduct.

138. Given this extensive history of misconduct and the City of Chicago's failure to meaningfully supervise or discipline Wojcik and others, it is apparent that Wojcik engaged in such misconduct because he had every reason to believe that the City of Chicago and its Police Department condoned his behavior.

139. A few examples of Defendant Wojcik's misconduct include:

a. In On June 30, 1988, the FBI registered a complaint against Defendant Wojcik with the Chicago Police Department's Office of Professional Standards ("OPS"). The FBI complaint reported that Defendant Wojcik and another officer were under investigation for alleged extortion of a weapon from an F.B.I. informant. The FBI report detailed how Defendant Wojcik arranged, under FBI surveillance, for an illegal transfer of a rifle with a telescopic sight was an informant to Defendant

Wojcik. An OPS investigation into the found that Defendant Wojcik had failed to properly inventory recovered property and had made a "false report" about this incident.

b. On March 21, 1988, Defendant Wojcik engaged in misconduct when he forced his way into a suspect's home, verbally abused the person, and slapped the suspect several times in the head and kicked him in the body.

c. In September 1989, Defendant Wojcik and others officer engaged in misconduct when they physically and verbally abused a citizen. This included yelling "I am going to break your fucking arm" and proceeding to twist his arm behind his back until his elbow fractured. It also included throwing him to the ground and kicking him.

d. In October 1989, Defendant Wojcik engaged in misconduct when he searched a citizen's apartment without permission or lawful justification and was verbally abusive.

e. In November 1989, Defendant Wojcik engaged in misconduct when he pointed a gun at a citizen, struck his car with a squad car, threw him and another individual to the ground, kicked him and another individual in the face, and punched him and two others in the face.

f. In March 1991, Defendant Wojcik engaged in misconduct when he punched a citizen in the face during an arrest and while he was being held in an interrogation room. The citizen required medical attention at a hospital. Defendant Wojcik admitted to investigators that he struck the citizen in the face.

g. In September 1991, Defendant Wojcik used excessive force on Gilbert Renslow.

h. In February 1992, Defendant Wojcik engaged in misconduct when he entered a woman's apartment without a search warrant or permission while searching for a suspect.

i. In October 1992, Defendant Wojcik engaged in misconduct when he and another detective entered a woman's apartment without a search warrant or permission.

j. In December of 1992, Defendant Wojcik beat Roosevelt Myles and attempted to force him to falsely confess to a crime that he did not commit. Defendant Wojcik beat Mr. Myles with a phone book and a flashlight while Mr. Myles was handcuffed to a wall and "kept slapping [him] until [he] said [he] will sign a statement." Defendant Wojcik likewise coerced witnesses into falsely identifying Mr. Myles.

k. On July 2, 1994, Defendant Wojcik engaged in misconduct when he verbally abused and threatened a citizen during a traffic stop. Wojcik used his police car to push the complainant's car into a tree.

l. In August 1994, Defendant Wojcik engaged in misconduct when he broke into his ex-girlfriend's home and struck a man inside the home in the man's head and face with a steel pipe-wrench and damaged various items of property. The man lost two dental caps in the beating. Defendant Wojcik was criminally charged with battery.

m. In January 1995, Defendant Wojcik engaged in misconduct when he entered a woman's apartment without a search warrant or permission and had pointed a gun at her.

n. On February 10, 1995, Defendant Wojcik engaged in misconduct when he came entered and searched a woman's home without a warrant, and choked her and threw her to the ground. The citizen required medical attention from a hospital for her

injuries.

o. In April 1995, Defendant Wojcik used physical force and threats to coerce a false confession out of Angel Rosado. When Rosado said he did not know anything about the homicide Defendant Wojcik was asking about it, Defendant Wojcik repeatedly hit and choked Rosado.

p. In May of 1995, Defendant Wojcik engaged in misconduct when he helped Defendant Guevara and others frame Thomas Sierra for a murder he did not commit. Mr. Sierra was exonerated in January 2018.

q. In June 1995, Defendant Wojcik and other officers engaged in misconduct when they abused a woman by pushing, punching, and kicking her in the stomach as they forced their way into her residence.

r. In January 1996, Defendant Wojcik engaged in misconduct when he and others entered a woman's apartment without a warrant in search of a suspect.

s. In February 1996, Defendant Wojcik engaged in misconduct when he searched a woman's car, bags, and person without permission or a warrant and threatened to physically abuse her.

t. In December 1997, Defendant Wojcik engaged in misconduct when he searched two apartments without a warrant or permission while looking for a suspect.

u. In October 1998 a citizen filed a complaint with OPS reporting that Defendant Wojcik had struck an individual on the head with a shotgun during an arrest. The victim was treated at the hospital for a laceration to the head, which he told doctors was caused by being struck with the shotgun.

v. In October 1998, Defendant Wojcik engaged in misconduct when he entered and

searched a residence without a warrant or authorization.

w. In August 1999, Defendant Wojcik engaged in misconduct when he, along with Defendants Guevara and Halvorsen, physically abused a citizen in their custody. Following the incident, the victim was examined by a Federal Bureau of Prisons physician's assistant and was treated for bruises to the face, body, right wrist and both arms, and a contusion to the inner elbow and scalp.

x. In 2000, Defendant Wojcik engaged in misconduct when he was assigned to investigate allegations made against Defendant Guevara by a defendant named Juan Hernandez. Mr. Hernandez had filed a complaint reporting that Defendant Guevara had framed him for a murder that he did not commit and had used improper line-up techniques in the process. Defendant Wojcik failed to properly investigation the allegations and instead covered up Defendant Guevara's misconduct.

y. In April 2000, Defendant Wojcik engaged in misconduct when he entered and searched a residence without a warrant or permission and arrested an individual without probable cause.

z. In March 2001, Defendant Wojcik engaged in misconduct when he physically abused a suspect in custody. Defendant Wojcik slapped, punched, choked, and kicked the man. Defendant Wojcik further refused to allow him to speak to an attorney.

aa. In April 2001, Defendant Wojcik engaged in misconduct when he searched a woman's residence without permission or a warrant and verbally abused her.

bb. In July 2001, Defendant Wojcik engaged in misconduct when he burst into 17-year-old Danny Ramirez's bedroom and grabbed him by the hair" and pulled him from

his bed. Defendant Wojcik was apparently looking for a suspect because he showed a photograph to Mr. Ramirez and demanded to know if the photo was of Mr. Ramirez or somebody else. Defendant Wojcik and others proceeded to search the apartment. Mr. Ramirez was later taken to Area 5 where other detectives threatened him.

cc. In July 2001, Defendant Wojcik engaged in misconduct when he searched an apartment without permission and stole $1400.

dd. In August 2001, Defendant Wojcik used physical force and threats to coerce a false confession from Miguel Skerrett. Despite Skerrett's repeated denials, Defendant Wojcik struck him, pushed his head up against the wall, called him a liar, punched him in the stomach, and kicked him in the back after he fell to the ground. Mr. Skerrett advised Defendant Wojcik that he was HIV-positive, that this made him particularly susceptible to pain, and that couldn't sustain any more abuse. Defendant Wojcik then told Mr. Skerrett what to say and Mr. Skerrett provided a false confession.

ee. In August 2001, Defendant Wojcik and other detectives used physical force and threats to attempt to coerce a false confession from Phonakone Sangathit. Defendant Wojcik punched him several times in the chest, punched him in the back of the head, and grabbed him by the neck and choked him while slamming his head into a wall until Mr. Sangathit lost consciousness.

ff. In January 2002, Defendant Wojcik and others engaged in misconduct when they searched a residence without warrant or justification.

gg. In July 2003, Defendant Wojcik engaged in misconduct when he searched a home

without a warrant or permission.

hh. In March 2004, Defendant Wojcik engaged in misconduct when he and another detective physically abused a man in custody.

ii. In June 2004, Defendant Wojcik engaged in misconduct when he filed false police reports to cover for the wrongful actions of officers who shot Seneca Smith.

jj. In July 2005, Defendant Wojcik engaged in misconduct when he and other officers arrested Ms. Yurus, who was placed unbuckled into the back of a police van and transported to the station. During the drive to the station, she was knocked out of her seat and suffered a laceration to her face. Upon arrival at the station, her requests for medical attention were denied. Defendant Wojcik repeatedly promised Ms. Yurus that she would be released if she told the police what they wanted to hear. Defendant Wojcik threatened to lock Ms. Yurus up and charge her with murder for the unrelated death of her son. In July 2006, Defendant Wojcik and others engaged in misconduct when they searched a woman's residence without justification or a warrant and damaged her property in the process.

kk. In December 2007, engaged in misconduct when he held a suspect for three days without charges before he was released. In response to a lawsuit filed against the City, OPS investigated eight officers including Defendant Wojcik, for their involvement in a wrongful conviction. The so-called "offender" alleged that, in October 1988, he was forced to sign a false confession following threats by Defendant Wojcik and others. (Ex. 19-60).

ll. In January 2009, Defendant Wojcik engaged in misconduct when he a refused to initiate a citizen complaint that officers pushed the victim, placed a foot on his back,

put him in a chokehold, kicked him, punched him in the face, waved a pocketknife at him and threatened to cut him, pushed him down the stairs, and stomped on him.

mm. In July 2014, Defendant Wojcik and others engaged in misconduct when they searched a woman's apartment without a warrant or justification.

nn. In October 2014, Defendant Wojcik engaged in misconduct when he approved police reports which later-released video revealed to be categorically false in the Laquan McDonald case where McDonald was shot to death by Chicago Police officer Jason Van Dyke. Defendant Wojcik was the "approving supervisor" involved in the subsequent investigation. Defendant Wojcik refused to participate in the investigation or to comply with a subpoena for his testimony. This prompted the Inspector General to file a declaratory judgment action seeking to compel Defendant Wojcik's compliance. The Inspector General further explained that Defendant Wojcik, through counsel, had repeatedly declined to state whether "he would invoke his Fifth Amendment rights against self-incrimination out of concern for possible criminal exposure in connection with his role in the McDonald investigation." The United States Department of Justice specifically cited the false police reports Defendant Wojcik had approved as an example of what it called "highly troubling" procedures.

140. Defendant Wojcik received little discipline from the City of Chicago or the Chicago Police Department for any of the conduct set out above.

141. In fact, the City of Chicago failed to supervise or discipline its police officers, including Defendants Guevara, Wojcik and the other Defendants. Defendants engaged in the

misconduct set forth in this complaint because they knew that the City of Chicago and its Police Department tolerated and condoned such conduct.

**COUNT I**
**42 U.S.C. § 1983 – Due Process**
**(Fourteenth Amendment)**

142. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

143. As described in detail above, the Defendants, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial and his right not to be wrongfully convicted and imprisoned.

144. In the manner described more fully above, the Defendants fabricated witness statements and identifications falsely implicating Plaintiff in the crime.

145. The Defendants knew this evidence was false.

146. The Defendants obtained Plaintiff's conviction using this false evidence, and they failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff during his criminal case.

147. The Defendants procured supposed eyewitness identifications of Plaintiff, which they knew to be false and unreliable, using unduly suggestive procedures. Despite this, Defendants caused these identifications to be used during Plaintiff's criminal trial.

148. In addition, the Defendants deliberately withheld exculpatory evidence from state prosecutors, Plaintiff, and Plaintiff's criminal defense attorneys, including evidence that that Defendants had manufactured false identifications of Plaintiff, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

149. Based upon information and belief, the Defendants also concealed, fabricated, and destroyed additional evidence that is not yet known to Plaintiff.

150. The Defendants' misconduct resulted in the unjust and wrongful criminal prosecution and conviction of Plaintiff and the deprivation of Plaintiff's liberty, thereby denying his constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, the prosecution of Plaintiff could not have and would not have been pursued.

151. The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

152. As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, forced and involuntary prison labor, and other grievous and continuing noneconomic injuries and damages as set forth above.

153. The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count V.

**COUNT II**
**42 U.S.C. § 1983 – Malicious Prosecution and Unlawful Detention**
**(Fourth and Fourteenth Amendments)**

154. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

155. In the manner described above, the Defendants, acting as investigators, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable

cause for doing so and in spite of the fact that they knew Plaintiff was innocent, in violation of his rights secured by the Fourth and Fourteenth Amendments.

156. In so doing, these Defendants maliciously prosecuted Plaintiff and caused Plaintiff to be deprived of his liberty without probable cause and to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

157. The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

158. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing noneconomic injuries and damages as set forth above.

159. The misconduct of the Defendants described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count VI.

**COUNT III**
**42 U.S.C. § 1983 – Failure to Intervene**

160. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

161. In the manner described above, during the constitutional violations described herein, one or more of the Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the duty and the opportunity to do so.

162. These Defendants had ample, reasonable opportunities as well as the duty to prevent this harm but failed to do so.

163. The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

164. As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing noneconomic injuries and damages as set forth above.

165. The misconduct of the Defendants described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count V.

**COUNT IV**
**42 U.S.C. § 1983 – Conspiracy to Violate Constitutional Rights**

166. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

167. In the manner described more fully above, the Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to fabricate evidence and to detain, prosecute, and convict Plaintiff for the Velez shooting, regardless of Plaintiff's guilt or innocence, and thereby to deprive him of his constitutional rights.

168. In so doing, these co-conspirators agreed to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

169. In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

170. The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

171. As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing noneconomic injuries and damages as set forth above.

172. The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count V.

**COUNT V**
**42 U.S.C. § 1983 – Policy and Practice Claim against the City of Chicago**

173. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

174. As described in detail above, the City of Chicago is liable for the violation of Plaintiff's constitutional rights because Plaintiff's injuries were caused by the policies, practices, and customs of the City of Chicago, as well as by the actions of policy-making officials for the City of Chicago.

175. At all times relevant to the events described in this complaint and for a period of time prior and subsequent thereto, the City of Chicago failed to promulgate proper or adequate rules, regulations, policies, and procedures for: conducting photographic and live lineup procedures by officers and agents of the Chicago Police Department and City of Chicago; the conduct of interrogations and questioning of criminal suspects; the collection, documentation, preservation, testing, and disclosure of evidence; the writing of police reports and taking of investigative notes; obtaining statements and testimony from witnesses; and maintenance of investigative files and disclosure of those files in criminal proceedings. In addition, or alternatively, the City of Chicago failed to promulgate proper and adequate rules, regulations,

policies, and procedures for the training and supervision of officers and agents of the Chicago Police Department and the City of Chicago, with respect to these subjects.

176. These failures to promulgate proper or adequate rules, regulations, policies, and procedures were committed by officers and agents of the Chicago Police Department and the City of Chicago, including the Defendants.

177. In addition, at all times relevant to the events described in this complaint and for a period of time prior thereto, the City of Chicago had notice of a widespread practice and custom by officers and agents of the Chicago Police Department and the City of Chicago under which individuals suspected of criminal activity, such as Plaintiff, were routinely deprived of their right to due process. For instance, it was common that suspects were prosecuted based on fabricated evidence, including fabricated eyewitness identifications and eyewitness identifications obtained using manipulated photographic or live lineup procedures.

178. Similarly, at all relevant times and for a period of time prior thereto, there existed a widespread practice and custom among officers, employees, and agents of the City of Chicago, under which criminal suspects were coerced to involuntarily implicate themselves, and witnesses were coerced to involuntarily implicate the police's chosen suspects, by various means, including but not limited to one or more of the following: (1) individuals were subjected to unreasonably long and uninterrupted interrogations, often lasting for many hours and even days; (2) individuals were subjected to actual and threatened physical or psychological violence; (3) individuals were interrogated at length without proper protection of their constitutional right to remain silent; (4) individuals were forced to sign or assent to oral and written statements fabricated by the police; (5) officers and employees were permitted to lead or participate in interrogations without proper training and without knowledge of the safeguards necessary to

ensure that individuals were not subjected to abusive conditions and did not confess involuntarily and/or falsely; and (6) supervisors with knowledge of permissible and impermissible interrogation techniques did not properly supervise or discipline police officers and employees such that the coercive interrogations continued unchecked.

179. In addition, at all times relevant to the events described in this complaint and for a period of time prior thereto, the City of Chicago had notice of widespread practices by officers and agents of the Chicago Police Department and the City of Chicago, which included one or more of the following: (1) officers did not record investigative information in police reports, did not maintain proper investigative files, or did not disclose investigative materials to prosecutors and criminal defendants; (2) officers falsified statements and testimony of witnesses; (3) officers fabricated false evidence implicating criminal defendants in criminal conduct; (4) officers failed to maintain or preserve evidence or destroyed evidence; and (5) officers pursued wrongful convictions through profoundly flawed investigations.

180. These widespread practices, individually and together, were allowed to flourish because the leaders, supervisors, and policymakers of the City of Chicago directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and control their officers, agents, and employees on proper interrogation techniques and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses such as those affecting Plaintiff.

181. The above widespread practices and customs, so well settled as to constitute de facto policies of the City of Chicago, were able to exist and thrive, individually and together, because policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

182. As a result of the policies and practices of the City of Chicago, numerous individuals have been wrongly convicted of crimes that they did not commit.

183. In addition, the misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago in that the constitutional violations committed against Plaintiff were committed with the knowledge or approval of persons with final policymaking authority for the City of Chicago or were actually committed by persons with such final policymaking authority.

184. Plaintiff's injuries were directly and proximately caused by officers, agents, and employees of the City of Chicago, including but not limited to the individually named Defendants, who acted pursuant to one or more of the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

**COUNT VI**
**State Law Claim – Malicious Prosecution**

185. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

186. In this count, "Defendants" does not include Valdez. ECF No. 77.

187. In the manner described above, the Defendants, acting as investigators, individually, jointly, and in conspiracy with one another, as well as within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate and to continue and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so.

188. In so doing, these Defendants caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

189. The judicial proceedings were terminated in Plaintiff's favor and in a manner indicative of his innocence when his conviction was vacated and charges against him were dropped.

190. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and in total disregard of the truth and Plaintiff's clear innocence.

191. As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing noneconomic injuries and damages as set forth above.

**COUNT VII**
**State Law Claim – Intentional Infliction of Emotional Distress**

192. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

193. In this count, "Defendants" does not include Valdez. ECF No. 77.

194. The actions, omissions, and conduct of the Defendants as set forth above were extreme and outrageous. These actions were rooted in an abuse of power and authority and were undertaken with the intent to cause or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

195. As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing noneconomic injuries and damages as set forth above.

**COUNT VIII**
**State Law Claim – Willful and Wanton Conduct**

196. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

197. In this count, "Defendants" does not include Valdez. ECF No. 77.

198. At all times relevant to this complaint the Defendants had a duty to refrain from willful and wanton conduct in connection with the Velez murder investigation.

199. Notwithstanding that duty, these Defendants acted willfully and wantonly through a course of conduct that showed an utter indifference to, or conscious disregard of, Plaintiff's rights.

200. As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing noneconomic injuries and damages as set forth above.

**COUNT IX**
**State Law Claim – Civil Conspiracy**

201. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

202. In this count, "Defendants" does not include Valdez. ECF No. 77.

203. As described more fully in the preceding paragraphs, the Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose and/or to achieve a lawful purpose by unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

204. In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

205. The violations of Illinois law described in this complaint, including Defendants' malicious prosecution of Plaintiff and their intentional infliction of emotional distress, were accomplished by Defendants' conspiracy.

206. The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

207. As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing noneconomic injuries and damages as set forth above.

**COUNT XI**
**State Law Claim – *Respondeat Superior***

208. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

209. While committing the misconduct alleged in the preceding paragraphs, the Defendants were employees, members, and agents of the City of Chicago, acting at all relevant times within the scope of their employment.

210. Defendant City of Chicago is liable as principal for all torts committed by its agents.

**COUNT XII**
**State Law Claim - Indemnification**

211. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

212. Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

213. The Defendants were employees, members, and agents of Defendant City of Chicago, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

214. Defendant City of Chicago is responsible to pay any judgment entered against the Defendants.

WHEREFORE, Plaintiff LOUIS ROBINSON, respectfully requests that this Court enter a judgment in his favor and against Defendants REYNALDO GUEVARA, GERI LYNN YANOW, as special representative of the ESTATE OF ERNEST HALVORSEN, ANTHONY WOJCIK, DANIEL ENGEL, JOHN MOSQUERA, CESAR ECHEVERRIA, EDWARD MINGEY, ROBERT BIEBEL and CITY OF CHICAGO, awarding compensatory damages, attorneys' fees, and costs against each Defendant, punitive damages against each of the Individual Defendants, and any other relief that this Court deems just and appropriate.

//

//

**JURY DEMAND**

Plaintiff, LOUIS ROBINSON, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Dated: February 20, 2025.

**LOUIS ROBINSON**

BY: s/ Tom Kayes

*One of Plaintiff's Attorneys*

Jon Loevy
Anand Swaminathan
Steven Art
Sean Starr
Tom Kayes
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, IL 60607